[Cite as *Lucas v. Perciak*, 2012-Ohio-88.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 96962**

---

## KARLA LUCAS, ET AL.

PLAINTIFFS-APPELLANTS

vs.

## THOMAS P. PERCIAK, ET AL.

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-724487

**BEFORE:** Cooney, J., Blackmon, A.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** January 12, 2012

**ATTORNEY FOR APPELLANTS**

Eric W. Tayfel
Tayfel and Associates
1360 West 9th Street
Suite 400
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEES**

**For Thomas P. Perciak, et al.**

John T. McLandrich
James A. Climer
Frank H. Scialdone
Mazanec, Raskin & Ryder Co., L.P.A.
100 Franklin's Row
34305 Solon Road
Solon, Ohio 44139

Kenneth Kraus
Law Director
City of Strongsville
16099 Foltz Industrial Parkway
Strongsville, Ohio 44149

**For Gary Rowe, et al.**

Susan C. Hastings
Squire, Sanders & Dempsey
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304

COLLEEN CONWAY COONEY, J.:

{¶ 1}  Plaintiffs-appellants, Karla Lucas ("Karla") and Tony Lucas ("Tony"), appeal the trial court's grant of summary judgment in favor of defendants-appellees, Thomas P. Perciak ("Perciak"), Thomas O'Deens ("O'Deens"), Charles Ross ("Ross"), Ron Whitney ("Whitney"), and the city of Strongsville (collectively "the Strongsville defendants").   We find no merit to the appeal and affirm.

{¶ 2}  This case arises from Karla's termination from employment at Southwest General Hospital.   Karla was terminated after Perciak, the mayor of Strongsville, sent Gary L. Rowe ("Rowe"), the interim CEO of Southwest, a memorandum that Karla claims contained defamatory statements related to her employment as a nurse at Southwest.   The facts, as set forth in affidavits and depositions in support of the motions for summary judgment, are as follows:

{¶ 3}  During the late night hours of May 5, 2007, Tony received a phone call from his niece, Ashley Snyder, requesting that he pick up her sister, Brandi Snyder ("Snyder"), after she was released from the Brunswick Police Department.   Tony picked up Snyder, and she stayed overnight at the Lucas home.

{¶ 4}  The next morning, Tony called the Strongsville police and informed Sgt. Frank Nosal ("Nosal") that he did not want to take Snyder home because he was concerned that her home was not safe.   While Nosal was speaking with Tony, Snyder's mother, Tammy Salopek ("Salopek"), also called the Strongsville police and informed

Nosal that she wanted to retrieve Snyder from the Lucas home. Nosal advised Tony that because there was no legal basis for him to keep Snyder, officers were on their way to pick her up and take her home to her mother.

{¶ 5} Shortly thereafter, Strongsville police officers O'Deens and Whitney arrived at the Lucas home. When the officers entered the house, Karla told them that Snyder's home was not safe and that she did not think Snyder should return home. The officers explained that because she was a minor, Snyder had to return home to her mother. It is undisputed that Karla became angry because she did not want the police to return Snyder to her mother. Snyder testified that Karla threatened O'Deens that if he were ever a patient at Southwest, she would not help him. Specifically, Snyder testified at deposition:

> "Then I remember my aunt Karla getting up and saying like you F'ing pig and — she said something about him. She said, if you ever come to my hospital where I work, I'll leave you in the bed or something. * * * I'm not 100 percent sure what she said, again, I'm sorry, but she said something along those lines, like if you ever come to my hospital where I work, I won't help you, or something like that."

{¶ 6} Southwest serves the Strongsville area and would likely be the hospital where a Strongsville police officer would be taken for necessary treatment. O'Deens sent a memorandum to the chief of police, Charles Goss ("Chief Goss"), describing the incident. O'Deens stated that Karla made "threatening and vulgar remarks" to him. He claimed she told him that she works in the emergency room at Southwest and that she

"hoped to see him in one of her beds" so she could "take care of him." In the concluding

paragraph, O'Deens wrote:

> "I found this situation to be very disturbing. I feel this is a situation that needs to be addressed by our administration. I found Karla Lucas' statements to be threatening and insulting in nature. I believe that her remarks have damaged the professional working relationship between SPD and the staff at Southwest General Hospital."

{¶ 7} Chief Goss forwarded the memorandum to Mayor Perciak, who forwarded

the letter to Rowe at Southwest. Rowe immediately began an investigation. Robin

Szeles ("Szeles"), director of emergency services at Southwest, received a corroborating

statement from Officer Whitney, who was present at the Lucas home with O'Deens when

Karla made the remarks. Szeles also contacted Karla's supervisor, Connie Klein

("Klein"), to inform her of the allegations. Klein testified that she was not surprised by

the allegations because she had witnessed Karla "lose control of her mouth" on other

occasions. She had previously counseled Karla on managing her anger and verbal

misconduct in public view.

{¶ 8} Szeles also contacted Sue Schloss ("Schloss") in human resources, and

Southwest's general counsel, Sue Scheutzow ("Scheutzow"). Schloss and Szeles met

with Karla to hear her version of the incident. When Szeles presented her with

O'Deens's version, Karla never denied she made inappropriate comments but simply

disputed the verbatim account attributed to her. At the conclusion of the investigation, it

was determined that Karla threatened the police in violation of Southwest's policy and Southwest discharged her.

{¶ 9} The complaint alleges claims of: (1) defamation against O'Deens, Whitney, Goss, and Rowe; (2) wrongful termination against Southwest; (3) intentional infliction of emotional distress against Perciak, O'Deens, Goss, Whitney, and Rowe; and (4) negligent hiring, retention and training or supervision against Perciak, O'Deens, Whitney, and Goss. Tony Lucas asserted a claim for loss of consortium. The court granted summary judgment in favor of all defendants on all claims. The Lucases now appeal, raising six assignments of error.[1]

### Standard of Review

{¶ 10} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201,

---

[1] The Lucases have not appealed the summary judgment granted in favor of Rowe and Southwest.

citing *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus.

<u>Defamation</u>

{¶ 11} In the first assignment of error, Karla argues the trial court erred in granting summary judgment in favor of O'Deens and Whitney on her defamation claim. She claims there are genuine issues of material fact as to whether she ever made the vulgar and threatening statements attributed to her.

{¶ 12} Defamation involves the publication of a false statement "'made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession.'" *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶9, quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council* (1995), 73 Ohio St.3d 1, 7, 651 N.E.2d 1283. To prove defamation, the injured party must show that: (1) a false and defamatory statement was made about plaintiff; (2) the statement was published without privilege to a third party; (3) it was made with fault of at least negligence on the part of the defendant; and (4) it was either defamatory per se or caused special harm to the plaintiff. *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.* (1992), 81 Ohio App.3d 591, 601, 611 N.E.2d 955.

{¶ 13} Karla contends there is a genuine issue of material fact as to whether she actually "uttered the words attributed to her" and denies having said them. In support of this assertion, Karla claims that Officer Whitney was not in a position to hear her words and, therefore, falsely corroborated O'Deens's statement. She also relies on a sworn statement Snyder made before the complaint was filed in which she described the incident. Karla claims Snyder "specifically denied all the quotes attributed to Karla Lucas." However, Snyder did not "specifically deny" any of the alleged remarks in her statement. On the contrary, Snyder's statement corroborates the Strongsville defendants' version of the incident.

{¶ 14} Although Snyder's sworn statement does not include Karla's exact words, it confirms that Karla made offensive comments to the Strongsville police. She stated that Karla called O'Deens a "pig," that she was screaming, and that she attempted to strike him. Snyder stated, in part:

> "He (O'Deens) — he honestly didn't say anything to offend anyone or to purposely get someone angry. All I remember is, he's just, like, I'm just trying to do my job. And he put up his hands was just like, I'm just trying to do my job. And Uncle Guy didn't start screaming. He was just handling it while — Aunt Carla [sic] is the one that started screaming, You're a pig, don't come back in here, ***and stuff***." (Emphasis added.)

{¶ 15} Throughout the statement, Snyder confirmed that Karla was angry and screaming other "stuff." Snyder did not explain what "other stuff" Karla said, but she never denied that Karla threatened O'Deens. Later in her statement, Snyder stated:

"All I remember is that she called him a pig and told him not to come back, and she was like — she was just screaming. You couldn't even understand half the stuff she said because she was screaming, like at the top of her lungs. And my uncle was holding her back because she was, like, ready to attack him."

Snyder further explained that Officer Whitney, who was standing outside the house, approached the screen door to enter the house when the screaming started, which indicates he could hear the commotion inside.

{¶ 16} Although Karla specifically denied making the alleged statements during her deposition, a nonmovant's own self-serving assertions, whether made in an affidavit, deposition, or interrogatory responses, cannot defeat a well-supported summary judgment motion when not corroborated by any outside evidence. *N. Eagle, Inc. v. Kosas,* Cuyahoga App. No. 92358, 2009-Ohio-4042, ¶26. Karla failed to provide any corroborating evidence. Therefore, we find no genuine issue of material fact that would preclude summary judgment in favor of the Strongsville defendants on Karla's defamation claim.

{¶ 17} Accordingly, the first assignment of error is overruled.

{¶ 18} In her second assigned error, Karla argues there are genuine issues of material fact as to whether Chief Goss and Mayor Perciak recklessly disseminated the defamatory statement. In her third assigned error, Karla argues there are genuine issues of material fact as to whether the Strongsville defendants are statutorily immune under R.C. Chapter 2744 because their creation and dissemination of defamatory statements "cannot be deemed anything other than bad faith or with malicious purpose." However,

because we have determined that Karla does not have an actionable claim for defamation and that the Strongsville defendants made no defamatory statements, we overrule the second and third assignments of error.

### Intentional Interference with Employment Relationship

{¶ 19} In her fourth and fifth assignments of error, Karla argues the trial court erred in granting summary judgment in favor of the Strongsville defendants because she established actionable claims for intentional interference with her employment relationship and intentional infliction of emotional distress. She contends the memorandum Perciak sent to her employer caused her termination of employment. She also contends the Strongsville defendants made defamatory statements to her employer for the purpose of causing her mental distress.

{¶ 20} As previously explained, the Strongsville defendants did not make or publish any defamatory statements about Karla. However, we address her intentional interference with employment and intentional infliction of emotional distress claims because they are independent and distinct claims apart from defamation.

{¶ 21} A defendant is liable for intentional infliction of emotional distress if his "extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another." *Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.* (1983), 6 Ohio St.3d 369, 453 N.E.2d 666, syllabus, abrogated on other grounds, *Welling v. Weinfeld*, 113 Ohio St.3d 464, 2007-Ohio-2451, 866 N.E.2d 1051.

"Serious emotional distress" goes beyond merely trifling disturbance, mere upset, or hurt feelings. *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 78, 451 N.E.2d 759. The emotional injury must be so severe and debilitating that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." Id.

{¶ 22} To recover on a claim for tortious interference with a contractual relationship, the plaintiff must prove: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 1995-Ohio-61, 650 N.E.2d 863; *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176, 1999-Ohio-260, 707 N.E.2d 853.

{¶ 23} The Strongsville defendants knew that Karla was employed by Southwest and that their communication to Southwest about Karla's threats to O'Deens would likely result in some disciplinary action. However, Karla cannot establish a viable claim for tortious interference with her employment contract because she cannot prove the "lack of justification" element of the claim. It is undisputed that Southwest serves the Strongsville area and that Strongsville police officers, including O'Deens, would most likely be taken to Southwest for treatment if injured. Mayor Perciak testified that he notified the interim president of Southwest that Karla had threatened O'Deens because some Strongsville police officers feared they may not receive proper treatment if Karla

were ever charged with their care. Perciak's primary concern was the safety of the Strongsville police officers rather than a malicious scheme to have Karla fired. This does not constitute the "extreme and outrageous conduct" necessary to establish intentional infliction of emotional distress but does constitute a justifiable reason for the communication. We therefore find no genuine issue of material fact that would require reversal of the summary judgment on Karla's intentional interference with employment and intentional infliction of emotional distress claims.

{¶ 24} Accordingly, we overrule the fourth and fifth assignments of error.

### Loss of Consortium

{¶ 25} In the sixth assignment of error, Tony Lucas argues the trial court erred in granting summary judgment to the Strongsville defendants on his loss of consortium claim. However, a loss of consortium claim is derivative in that it is dependent upon the defendants' having committed a legally cognizable tort upon Karla. *Bowen v. Kil–Kare, Inc.* (1992), 63 Ohio St.3d 84, 93, 585 N.E.2d 384. Since Karla failed to prove any of her tort claims against the Strongsville defendants, Tony's loss of consortium claim fails as a matter of law.

{¶ 26} Accordingly, the sixth assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
COLLEEN CONWAY COONEY, JUDGE

PATRICIA ANN BLACKMON, A.J., CONCURS;
SEAN C. GALLAGHER, J., DISSENTS (WITH SEPARATE OPINION ATTACHED).

SEAN C. GALLAGHER, J., DISSENTING:

{¶ 27} I respectfully dissent from the majority's decision. In this case, the defamatory statement at issue is "[Karla] hoped to see [O'Deens] in one of her beds so she could take care of him." There is no dispute that an altercation occurred when the police officers attempted to remove the minor from the Lucas home and that Karla angrily reacted to the police officers' intervention.[2] The only issue before the trial court is whether there are genuine issues of material fact as to whether Karla actually threatened O'Deens's life, not whether an altercation occurred.

---

[2]While I am cognizant that police officers responding to difficult situations must take threats seriously for their own safety, I must note and question the medium that O'Deens used to "prosecute" Karla's conduct. If the officer felt threatened or that Karla obstructed his official duty, citations could have been issued so that Karla received her right to due process through the court system. The officer's response of sending a letter through a chain that would arrive at Karla's employer arguably circumvents the legal process that should have been used to protect the officer's safety.

{¶ 28} The majority relies on *Kosas*, 2009-Ohio-4042, for the proposition that trial courts can ignore a party's unfavorable deposition testimony if the testimony is self-serving and is not corroborated by outside evidence. Such an overreaching statement forecloses most, if not all, defamation claims and sets a dangerously broad precedent. Defamation cases largely depend on the parties' testimony, the quintessential "he-said, she-said" cases. Credibility is not an issue to be resolved on summary judgment.

{¶ 29} In this case, Karla consistently maintained that she did not threaten O'Deens in the manner he described in the letter that ultimately cost Karla her job. That is the only issue on the defamation claim. If she yelled, screamed, and insulted the police officers, she still can maintain a defamation claim if she did not actually say that she would "take care of" O'Deens if she saw him in the emergency room, a fact she steadfastly denied. Further, it does not matter how many people heard Karla say anything for the purposes of summary judgment. Her consistent deposition testimony presents a genuine issue of material fact as her credibility is not a factor to be weighed pursuant to Civ.R. 56. If this does not present an issue of fact to be resolved by the trier of fact, few plaintiffs will ever survive summary judgment for defamation claims. For this reason, there is also a genuine issue of material fact regarding the tortious interference claim. I would reverse the decision of the trial court and remand the case for further proceedings.