[Cite as *Mills v. Westlake*, 2016-Ohio-5836.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103643**

# BARBARA MILLS

### PLAINTIFF-APPELLANT

vs.

# CITY OF WESTLAKE, ET AL.

### DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-14-826449

**BEFORE:**    Blackmon, J., McCormack, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**    September 15, 2016

**FOR APPELLANT**

Barbara Mills, pro se
22465 Brookpark Road
Fairview Park, Ohio 44126


**ATTORNEYS FOR APPELLEES**

**For City of Westlake and Keenan Cook, Officer**

Tami Z. Hannon
Frank H. Scialdone
John T. McLandrich
Mazanec Raskin, Ryder Co., L.P.A.
100 Franklin's Row
34305 Solon Road
Cleveland, Ohio 44139


**For Ellen Hartrup**

Robert J. Koeth
Anne E. Leo
Koeth Rice & Leo Co., L.P.A.
1280 West Third Street
Cleveland, Ohio 44113


**For Arthur and Beth Hohman**

Ronald V. Rawlin
Kimberly A. Brennan
Terrance P. Gravens
Rawlin Gravens Co., L.P.A.
1422 Euclid Avenue
Cleveland, Ohio 44115

PATRICIA ANN BLACKMON, J.:

{¶1}    Barbara Mills ("Mills") appeals pro se from the trial court's journal entries granting summary judgment to defendants Arthur Hohman ("A. Hohman"), individually and in his capacity as a Westlake auxiliary police officer; Beth Hohman ("B. Hohman"); Ellen Hartup ("Hartup"); and Westlake Police Officer Keenan Cook ("Officer Cook"). Additionally, Mills appeals the court's award of sanctions for frivolous conduct against her and in favor of the Hohmans.   Mills assigns four errors[1] for our review.

{¶2}    Having reviewed the record and pertinent law, we affirm the trial court's decision.   The apposite facts follow.

{¶3}    In August 2010, the Westlake City School District moved a school bus stop to the corner of Primrose Lane and Canterbury Road, and determined that the "designated place of safety" for this stop was the driveway apron located at 3823 Canterbury Road. According to Jonathan Perkins ("the bus driver"), who was the Westlake bus driver assigned to this route, a "designated place of safety * * * is a place away from the road where [the children] are out of danger, to where they can stand there until the bus leaves." At the time, Mills's mother owned the house located on this property.

{¶4}    The Hohman's eight-year-old son B.H. and the Hartup's eight-year-old son P.H. were assigned to this bus stop.   Early in the school year 2010,[2] B. Hohman was

---

[1]*See* appendix.

[2]B. Hohman and A. Hohman testified that the incident between Mills and B. Hohman occurred early in the school year.   Mills, on the other hand, argues that it occurred in December.   Although the parties disagree on the time frame, there is

waiting for her son at the bus stop when Mills pulled out of her mother's driveway, stopped, and yelled out of her car window, "I don't want my driveway used as a bus stop." According to B. Hohman, Mills was "very angry" at the time. B. Hohman told Mills that they used the driveway only for a short time and that B. Hohman did not choose the bus stop location. Mills said, "I have a dying mother, and if the bus is in front of my house, an ambulance can't get in." B. Hohman told Mills that she was "not having this discussion with" her.

{¶5} On December 9, 2010, an incident occurred between Mills and B.H. when he got off the bus. According to Mills, as she was leaving her mom's house she saw B.H. in the apron of the driveway. Mills alleges that she "told him that she'd already spoken to his mom and the school system and needed for him to stay out of to keep from blocking [sic] the driveway." According to Mills, she did not yell at B.H.

{¶6} However, B.H. testified that Mills yelled at him to "get the hell off my driveway and stay off." All other witnesses' testimonies and statements corroborated B.H.'s testimony. According to B. Hohman, B.H. came home from the bus stop that day "crying. He was hysterical * * * because the lady yelled at him." P.H. witnessed the incident and testified that Mills yelled at B.H. According to Hartup, her son P.H. came home from the bus stop that day "visibly upset," because Mills yelled at him and B.H. to "get the hell out of my driveway." Additionally, a neighbor, Monica Peters ("Peters"),

---

no dispute that the event occurred.

testified that she heard noise outside, opened her front door, and saw Mills "standing in the apron of her driveway yelling at the kids."

**{¶7}** That evening, A. Hohman reported the matter to the police. Officer Cook spoke with the Hohmans and the Hartups, and then spoke with Mills. According to Officer Cook, Mills became agitated and irate, accused the boys of trespassing, and denied yelling at B.H. Officer Cook ended the conversation because Mills was "being unreasonable and unwilling to try to find a solution." He advised her not to yell at the boys again and to call the police if there were any future problems.

**{¶8}** The next day, on December 10, 2010, A. Hohman and Hartup were waiting for their boys to get off the school bus when Mills came speeding down the road in her vehicle. According to A. Hohman, Hartup, B.H., P.H., and the bus driver, it appeared that Mills was not going to slow down or stop at the bus's stop sign. The driver honked his horn to alert the children not to cross the street. Mills stopped her car in the street, got out of her vehicle, and began yelling at A. Hohman for contacting the police.

**{¶9}** A. Hohman testified that Mills "was driving at a high rate of speed. The bus driver had to get the stop signs out, had to actually physically blow the horn before she abruptly stopped * * *." According to A. Hohman, Mills "drove * * * her vehicle towards the bus and then when she jumped out of the car she came walking towards me. What she was going to do at that point I have no idea. She is out of her vehicle. My concern at that point is basically for everybody."

**{¶10}** B.H. testified that "a car came speeding by and then it was the same lady and she got out of the car and started yelling at my dad. * * * I don't know if she was driving it at me or not [but] she seemed very close to almost hitting us."

**{¶11}** P.H. stated that "all of a sudden a car came screeching down the street and it was [Mills]. * * * She came out of her car and started yelling at my [mom]." According to Hartup, Mills "came speeding north-bound on Canterbury and the bus driver blew his horn as it looked like she was going to blow right threw [sic] the bus 'stop' sign. She came within 2 feet of the bus, and got out of her car, stood in the middle of Canterbury, screaming at us * * *." While Mills was yelling, Hartup escorted B.H. and P.H. across the street because she feared for their safety.

**{¶12}** The bus driver testified that after the boys got off the bus that day, a vehicle came down the street

> and it sped up — it looked to me like it was going about 45 miles an hour. It was increasing speed and the vehicle crossed the center line, and I thought it was a drunk driver and it was going to hit me. * * * Honestly, I was terrified * * *.

> I kept my hand in the air so the children wouldn't cross, * * * and I saw the vehicle coming very fast, and I blared the horn for a good two, three seconds, to let the children know, you need to be looking at me, you need to stay where you are, and the oncoming vehicle, I was trying to get it through to them, hey I'm stopped, I'm making a student drop.

> The vehicle didn't slow down until the last 30 feet, and pulled halfway into the driveway where the place of safety was, and she, the driver, [Mills], got out of her vehicle, started yelling at the parents — I couldn't hear what she was saying, but I could hear her yelling at the parents.

I didn't know what to do, because I didn't want the kids in danger. The place of safety was blocked, and there was something going on, something that, you know, I can't let these kids cross.

{¶13} Peters witnessed this incident from her front porch and gave the following statement to the police:

On Friday 12/10/10, the bus stopped again at the corner of Primrose and Canterbury around 2:30 p.m. The bus was stopped with the stop sign out. A beige car kept coming northbound. My husband and I thought it wasn't going to stop as the same two boys started to walk in front of the bus to cross Canterbury. The car was about two feet from the bus bumper. At that point our neighbor Barbara Mills got out of her car and stood in the street yelling at the boys and the mother of one * * * and the father of the other. Ms. Mills has a horrible temper which my husband and I can attest to. * * * She scared us and we're adults. I can just imagine how those 2 young boys felt.

{¶14} According to Mills, however, she was trying to get into her mom's driveway on December 10, 2010, but A. Hohman and Hartup were blocking it and would not move. Mills alleges that she "got partway out" of her car and "said in a normal tone of voice to [A. Hohman] that she was * * * going to tell the mayor he was blocking the driveway." Mills testified that there was neither a school bus nor children present at the time. Mills further stated that Hartup's, A. Hohman's, B.H.'s, P.H.'s, and the bus driver's statements to the police were false and that they perjured themselves in various legal proceedings.

{¶15} That same day, A. Hohman, B. Hohman, Hartup, B.H., and P.H. gave written statements to the police. Per Hartup's request, on December 14, 2010, Westlake moved the bus stop a few houses down the road; however, B.H. and P.H. still had to walk on the sidewalk past Mills's mother's house to get home.

{¶16} After the bus stop was moved, Mills began parking her car in the apron of her mother's driveway blocking pedestrian sidewalk traffic around the time the bus dropped the children off. Mills remained in the car with the vehicle running. According to Mills, she was using her cell phone, which had spotty reception in areas other than the apron of her mother's driveway.

{¶17} The bus driver testified that "I noticed that [Mills's] vehicle was parked on the actual sidewalk, * * * she parked the vehicle across the sidewalk * * *. I was worried about the children because they would have to go around the parked car and sidewalk and they would either have to walk on to the property or closer to the road."

{¶18} On January 3, 2011, Hartup and Peters reported Mills's behavior to Officer Cook. According to Officer Cook, Hartup "was concerned for the safety of the children" because "a person would have to either walk in the road or onto the residential property" to get around Mills's running car. Hartup also supplied the police with photographs of Mills's vehicle parked blocking the public sidewalk. Hartup noted in her statement to the police that as soon as the bus dropped the boys off, Mills moved her vehicle.

{¶19} On January 4, 2011, A. Hohman reported Mills's behavior to Officer Cook, and Hartup and Peters reported it for the second day in a row. According to A. Hohman, he and his son had to either walk around Mills's running vehicle or walk in the drainage ditch to avoid Mills's mother's property. A. Hohman stated that given Mills's odd behavior, he was concerned for his son's safety and thought Mills might suddenly drive her car in reverse while they were behind it. A. Hohman and B. Hohman stated that B.H.

"is scared to death" to go to the bus stop and asks his parents everyday, "Who is going to meet me at the bus?" B.H. will not walk by himself past Mills's mother's house.

{¶20} According to Hartup, "[P.H.] is afraid of [Mills] and does not want to ride the bus anymore. I will continue to meet that bus everyday as I am afraid [Mills] might do something to one of the boys." P.H. stated that he asked his mom to wait for him at the bus stop "just to make sure that it didn't happen again."

{¶21} The Westlake prosecutor reviewed the police reports and witness statements at issue and interviewed Officer Cook, Hartup, and A. Hohman. On January 5, 2011, the prosecutor determined there was probable cause to charge Mills with menacing and instructed the police to issue an arrest warrant. That same day, Officer Cook went to Mills's mother's house to arrest Mills. Mills was not there at the time, but Mills's mother let the police into her home to wait for Mills. When Mills arrived, Officer Cook arrested her.

{¶22} Mills's menacing case went to trial, and she was acquitted. Mills filed a civil case, which she voluntarily dismissed after summary judgment was briefed. Mills refiled her case, and on July 24, 2014, amended her complaint to assert claims for malicious prosecution, abuse of process, and civil conspiracy against A. Hohman, B. Hohman, Hartup, and Officer Cook. Additionally, Mills included a claim for false arrest against Officer Cook and A. Hohman in his capacity as an auxiliary police officer. The Hohmans asserted a counterclaim for frivolous conduct.

{¶23} On May 27, 2015, the court granted all of the defendants' motions for summary judgment. The Hohman's counterclaim remained pending, and on June 11, 2015, the Hohmans also filed a motion for sanctions. The court ruled that, in lieu of a trial on the frivolous conduct counterclaim, it would hold a hearing on the motion for sanctions. On July 29, 2015, the court held this hearing, but after listening to opening statements, the court found that it had "enough here * * * to make a decision as to whether the actions of plaintiff and plaintiff's counsel justify an award at all as to frivolous conduct under Rule 11 or 2323.51." Neither party objected to the court deciding the issue on the documents and evidence submitted.

{¶24} On August 3, 2015, the court granted the Hohmans' motion for sanctions against Mills pursuant to R.C. 2323.51, finding that Mills engaged in frivolous conduct, and denied the motion for sanctions against Mills's attorneys under Civ.R. 11. On October 8, 2015, the court held a hearing to determine the amount of sanctions and awarded the Hohmans $33,672.68 for legal fees and expenses. This appeal followed.

## Summary Judgment

{¶25} Appellate review of granting summary judgment is de novo. Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that (1) there is no genuine issue of material fact; (2) they are entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

{¶26} To succeed on a motion for summary judgment, the "moving party carries an initial burden of setting forth specific facts that demonstrate its entitlement to" judgment as a matter of law. *Huntington Natl. Bank v. Blout*, 8th Dist. Cuyahoga No. 98514, 2013-Ohio-3128, ¶ 13. "If the party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, summary judgment is appropriate only if the nonmoving party fails to establish the existence of a genuine issue of material fact." *Id.*

## Malicious Prosecution

{¶27} To succeed on a malicious prosecution claim, a plaintiff must show the following: "(1) malicious institution of prior proceedings against the plaintiff by defendant, (2) lack of probable cause for the filing of the prior lawsuit, (3) termination of the prior proceedings in plaintiff's favor, and (4) seizure of plaintiff's person or property during the course of the prior proceedings." (Citations omitted.) *Crawford v. Euclid Natl. Bank*, 19 Ohio St.3d 135, 139, 483 N.E.2d 1168 (1985).

{¶28} Underlying the case at hand are four counts of menacing brought against Mills pursuant to Westlake Codified Ordinance 537.06, which states that "No person shall knowingly cause another to believe that the offender will cause physical harm to the person * * * or a member of the * * * person's family."

{¶29} In the defendants' motions for summary judgment, they argue that the Westlake prosecutor made the decision to charge Mills with menacing; therefore, they are insulated from liability. However, the Ohio Supreme Court has recognized that a

malicious prosecution action may be brought against an individual who is not a government employee. A "private person who initiates or procures the institution of criminal proceedings against another is not subject to liability unless the person against whom the criminal proceedings were initiated proves all * * * of the above-listed elements" of malicious prosecution. *Ash v. Ash*, 72 Ohio St.3d 520, 522, 651 N.E.2d 945 (1995).

{¶30} It is undisputed that proceedings were instituted against Mills, and she was arrested, tried, and ultimately acquitted. The focus of our inquiry is not who initiated these proceedings; rather, our focus is whether there was probable cause to indict Mills, which in turn indicates whether there was malice. *See, e.g., Mecher v. O'Brien*, 8th Dist. Cuyahoga Nos. 89008 and 89626, 2007-Ohio-6633, ¶ 34 (in a claim for malicious prosecution, "the determinative issue is * * * whether there was a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused was guilty of the offense with which he or she was charged"). "The absence of probable cause is the gist of an action for malicious prosecution, and malice may be inferred from the absence of probable cause." *Brand v. Geissbuhler*, 8th Dist. Cuyahoga No. 70565 1997 Ohio App. LEXIS 709 (Feb. 27, 1997).

{¶31} B.H. and P.H. testified that they were afraid of Mills, and the boys' parents testified that they feared Mills might cause physical harm to their children. Peters testified that she and her husband were scared of Mills and "you could tell the boys were

scared" of her as well. Officer Cook testified that B.H. and P.H. were visibly "upset" when he spoke with them, and based on his interviews with the Hohmans, the Hartups, and Mills, he had evidence "that led me to believe that [Mills] possibly had yelled at the boys." Officer Cook testified that it was his understanding that Mills's conduct and the boys' reactions exhibited the crime of menacing, and he reported this information to the prosecutor.

{¶32} The Westlake prosecutor's affidavit reads, in part, as follows:

As prosecutor, I reviewed the police reports and witness statements for the complaints against Barbara Mills relative to her conduct on December 9, 2010 and December 10, 2010 involving Art Hohman and the minor children, [B.H.] and [P.H.]. In this case, we attempted to resolved the matter without filing criminal charges. * * * I was concerned due to the continuing nature of Ms. Mills's conduct, despite Officer Cook having spoken to her regarding her behavior. I was further concerned that the behavior had not stopped despite a change in location of the school bus stop. Based on Ms. Mills's continuing conduct, I determined that criminal charges were necessary in this situation in order to prevent any further instances. I determined that probable cause existed to pursue criminal charges against Barbara Mills for menacing.

{¶33} The appellees have pointed to ample evidence in the record that there was probable cause to charge Mills with menacing, which would negate the "malice" element of her malicious prosecution claim. To overcome summary judgment, Mills would have had to provide evidence that created a genuine issue of material fact regarding the allegations at hand. In her oppositions to summary judgment, as well as her appellate brief, Mills points to inconsistent testimony that she argues should be enough to defeat summary judgment. Our review of the record, however, shows that the testimony

brought to our attention is neither in conflict with other evidence in the record nor material to the issues at hand.

{¶34} For example, Mills argues that there is conflicting testimony regarding the events that occurred on December 10, 2010. According to Mills, the Westlake City School District's Director of Transportation's testimony contradicts the "trial testimony from school bus driver J. Perkins who said he witnessed Mills driving toward his stopped school bus." However, the director simply testified that he did not recall off the top of his head the name of the bus driver who reported "[t]hat the students were standing on a sidewalk at the corner and a car came basically barreling off the street into the driveway."

{¶35} A second example of Mills arguing that a genuine issue of material fact exists is her allegation that B. Hohman's testimony is inconsistent in that she first stated that B.H. "walked" home crying on December 9, 2010, then subsequently testified that he "ran" into the house crying that day. According to Mills, "[s]uch material testimony change precludes dismissal on Summary Judgment." We disagree. A witness's testimony that their child a) walked home crying, and b) ran into the house crying does not amount to a credibility-challenging inconsistency.

{¶36} Upon review, we find that Mills has failed to show a genuine issue of material fact, and the defendants are entitled to judgment as a matter of law on Mills's malicious prosecution charge.

## Abuse of Process

{¶37} "[T]he three elements of the tort of abuse of process are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted for the wrongful use of the process." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294, 298, 626 N.E.2d 115 (1994).

{¶38} This court has held that "the ulterior motive contemplated by an abuse of process claim generally involves an attempt to gain an advantage outside the proceeding, using the process itself as the threat. * * * Conversely, abuse of process does not occur when a party uses the court to pursue a legal remedy that the court is empowered to give." *Sivinski v. Kelley*, 8th Dist. Cuyahoga No. 94296, 2011-Ohio-2145, ¶ 36-37.

{¶39} Upon review, we find that Mills has failed to set forth competent, credible evidence to support an abuse of process claim. Specifically, Mills argues that the ulterior motive behind the menacing charges was for the defendants to retaliate against her for complaining to the mayor that they were blocking her mother's driveway. Mills offers no evidence to support this allegation. Rather, the evidence in the record suggests that menacing charges were investigated and brought against Mills as a result of her behavior and to protect the children. This is a proper use of the justice system. *See Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (a general governmental "interest is of course that of effective crime prevention and detection").

**{¶40}** This court has held that "a nonmovant's own self-serving assertions, whether made in an affidavit, deposition, or interrogatory responses, cannot defeat a well-supported summary judgment motion when not corroborated by any outside evidence." *Lucas v. Perciak*, 8th Dist. Cuyahoga No. 96962, 2012-Ohio-88, ¶ 16.

**{¶41}** Looking at the evidence in a light most favorable to Mills, as we must, we find no genuine issues of material fact relating to an abuse of process claim. Accordingly, the defendants are entitled to judgment as a matter of law, and Mills's first assigned error is overruled.

### False Imprisonment

**{¶42}** "False imprisonment has been succinctly defined in the following manner: '* * * to confine one intentionally without lawful privilege and against his consent with a limited area for any appreciable time, however short.' 1 Harper and James, The Law of Torts, 226, Section 3.7 (1956)." *Feliciano v. Kreiger*, 50 Ohio St.2d 69, 71, 362 N.E.2d 646 (1977).

**{¶43}** In the case at hand, Mills's false imprisonment claim is based on her allegation that Officer Cook arrested her on January 5, 2011, without a warrant. The municipal court docket for Mills's menacing case shows that a search warrant was issued on January 5, 2011. *Westlake v. Mills,* Rocky River Mun. Court Nos. 11CRB0037 and 11CRB0038. However, Officer Cook's testimony on this issue is somewhat ambiguous.

**{¶44}** He testified that the warrant issued was "a type of warrant form saying she's already been arrested." He further explained that "[i]n lieu of waiting for the warrant we

make the arrest based on the complaints, the signed complaints and then we fill out that form." Asked why the police did not wait until a judge issued a warrant for Mills's arrest, Officer Cook replied, "There was nothing preventing me from waiting for a warrant but we chose not to wait because of the safety of the children." Officer Cook further testified that the basis for Mills's arrest was the written witness complaints and the determination of probable cause.

{¶45} Whether a valid warrant was issued, however, is not dispositive of Mills's false imprisonment claim. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). In the case at hand, Officer Cook went to Mills's mother's house to arrest Mills as a result of Mills being indicted for menacing. We have already determined previously in this opinion that there was probable cause for the menacing charges, and we use the same analysis to conclude that there was probable cause to arrest Mills.

{¶46} Accordingly, Mills's claim for false imprisonment against Officer Cook is without merit, and the court properly granted his motion for summary judgment on this issue. Mills's third assigned error is overruled.

### Civil Conspiracy

{¶47} The elements of a claim for civil conspiracy are "1) a malicious combination; 2) two or more persons; 3) injury to person or property; [and] 4) existence

of an unlawful act independent from the actual conspiracy." *Scanlon v. Gordon F. Stofer & Bro. Co.*, 8th Dist. Cuyahoga Nos. 55467 and 55472, 1989 Ohio App. LEXIS 2528 (June 22, 1989).

{¶48} As we have found that the court properly granted summary judgment to all defendants on all of Mills's claims, Mills necessarily has failed to show the "existence of an unlawful act independent from the actual conspiracy." This failure is fatal to her civil conspiracy claim. *Lowry-Greene v. Brighton Hotel Corp.*, 8th Dist. Cuyahoga No. 60838, 1992 Ohio App. LEXIS 5596 (Aug. 10, 1992) ("Without the existence of the underlying unlawful acts * * * there can be no claim for civil conspiracy.").

## Frivolous Conduct Sanctions

{¶49} Pursuant to R.C. 2323.51, a court may award attorney fees against a party for frivolous conduct committed in a civil case. Conduct is frivolous when: "(i) It obviously serves merely to harass or maliciously injure another party to the action * * *. (ii) It is not warranted under existing law * * *. (iii) The conduct consists of allegations or other factual contentions that have no evidentiary support * * *. (iv) The conduct consists of denials or factual contentions that are not warranted by the evidence * * *." R.C. 2323.51(A)(2)(a).

{¶50} Prior to awarding attorney fees for frivolous conduct, the court must conduct a hearing that "allows the parties and counsel of record involved to present any relevant evidence * * *." R.C. 2323.51(B)(2)(c). The court must then make a determination

"that the conduct was frivolous and that a party was adversely affected by it" and determine the amount of the award.

{¶51} Ultimately, the decision whether to impose sanctions for frivolous conduct lies within the trial court's discretion. However, "[o]n review a trial court's findings of fact are given substantial deference and are reviewed under an abuse of discretion standard, while legal questions are subject to de novo review by an appellate court." *ABN Amro Mtge. Group, Inc. v. Evans*, 8th Dist. Cuyahoga No. 98777, 2013-Ohio-1557, ¶ 14.

{¶52} In the case at hand, the court held a hearing on the Hohmans' motion for sanctions on July 29, 2015. The Hohmans and their counsel were present, and Mills and her three attorneys were present. The court heard opening statements and arguments from the Hohmans' and Mills's attorneys, and asked questions regarding the alleged conduct. The court then stated the following:

> I had initially anticipated that counsel would want to present testimony. I'm not certain that testimony would be called for at this juncture. We have the pleadings, we have the briefs on the summary judgment, we have the motion and briefs on the sanctions question, which I think are fairly voluminous as to not only the facts, but also the positions of the individuals involved.

{¶53} On August 3, 2015, the court issued a journal entry granting in part and denying in part the Hohmans' motion for sanctions. The court stated that, at the hearing, "counsel of record and parties appeared. Testimony was taken. The court notes that evidence was presented in the previously filed briefs." The court denied the sanctions motion as to Mills's attorney, reasoning that "[t]he statements made by [Mills's attorney]

in open court support a finding that he did not simply rely upon the claims of plaintiff, but that he acted in good faith in attempting to confirm the veracity of her assertions."

{¶54} The court granted the motion for sanctions regarding Mills, making the following findings:

> The Court finds Ms. Mills's conduct more troubling. She claims that she was a victim of inappropriate action, indeed a civil conspiracy, on the part of the Hohmans. When viewed objectively, as this Court must do, the Court finds that these assertions are unsupported by fact, and thus are unwarranted. Other than pure conjecture, plaintiff offers no tangible evidence whatsoever to support her claim.

> The Court is left with the inescapable conclusion that Ms. Mills's maintenance of this action, even though re-filed by counsel, was intended to harass or maliciously injure the Hohmans. The Court further finds that her claims were not warranted under existing law, nor corroborated with any evidentiary support. Even if the first filing of this case was justified, plaintiff's subsequent re-filing and ensuing behavior in pursuing her vendetta against defendants were not.

{¶55} Subsequently, the court granted Mills's attorneys' motions to withdraw as counsel, based on their "deteriorated" relationship with Mills. The court afforded Mills time to retain new counsel, but she did not do so. The court held a second hearing on October 8, 2015, to determine the amount of the sanctions awarded against Mills. Two of the attorneys who represented the Hohmans in an insurance defense capacity testified as to the work performed and billed at a rate of $115.00 to $140.00 per hour. Additionally, an expert witness testified as to the reasonableness of the fees, and the

litigation specialist from Nationwide Insurance who handled the Hohmans' claim testified as to the reasonableness of the amount of legal work performed in this case.

{¶56} Mills refused her opportunity to cross-examine the first two witnesses and had limited questions on cross-examination for the expert and the insurance representative. For example, Mills questioned the expert's objectiveness implying that he was "very much working together" with the Hohmans' attorney "because they told everyone how much they hated me * * *." This "question" was stricken from the record. As to the insurance witness, Mills asked her the following question: "So you don't — you're not really the person that would authorize payment, that would be someone above you, you just coordinate?" The witness answered, "No, I actually authorize the payment. It's submitted through a system and I review the billing and I either approve or disapprove."

{¶57} A. Hohman and B. Hohman also testified at the sanctions hearing as to the expenses incurred in defending this lawsuit. On cross-examination, Mills asked A. Hohman and B. Hohman if they made any false statements in this case. The court sustained defense counsel's objection to this question.

{¶58} Finally, defense counsel requested an award of $33,672.68, which was the total amount of the Hohmans' legal fees for defending this case.

{¶59} Mills did not call any witnesses or present any evidence. Rather, at the hearing to determine the amount of sanctions, she claimed that she did not get "a chance

to present any evidence" regarding the imposition of sanctions and that she "did not have a chance to get an attorney * * *."

**{¶60}** The court responded to Mills as follows:

You have had ample time to secure representation.  If your motion * * * to continue the hearing had asserted, for example, you have contacted an attorney, but he or she was unavailable today, I certainly would have continued it to a date when that attorney could be present.

If you had given the name of an attorney and said that you are in the process of retaining counsel, again, I would have cut you a break on that.

* * *

This Court has — again, I'll use the word 'indulged' your needs or claims repeatedly throughout this process.  I think today's hearing is just another example of the efforts that I have gone through to enable you to have every opportunity to present your defense.

**{¶61}** On October 16, 2015, the court awarded the Hohmans "$33,672.68 for their legal fees and expenses," finding that "after reviewing the witness testimony, evidence proffered, and plaintiff's objections, [the] legal fees are reasonable and the work performed was necessary."  Upon review, we cannot say that the court abused its discretion or misapplied the law in awarding sanctions against Mills for frivolous conduct.  Accordingly, her third and fourth assigned errors are overruled.

**{¶62}** Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

TIM McCORMACK, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR

# APPENDIX

Assignments of Error

I.    The trial court erred in granting all of Defendants' Motions for Summary Judgment, where the Plaintiff's Complaint and Ohio Civil Rule 56(C) materials filed with the trial court, demonstrate conflicting testimony and material/historical facts in dispute that are the province of the jury as triers of fact to wright and decide upon; and where the Complaint is based on valid case law and an adequate quantity of evidence to preclude Summary Judgment.

II.   The trial court erred in granting Defendant Keenan Cook's Motion for Summary Judgment on Plaintiff's False Imprisonment Cause of Action where the allegations in the Complaint and discovery materials produced, demonstrate conflicting witness testimony and disputed material facts regarding Plaintiff's arrest that reasonable minds could find constitute a lack of probable cause for arrest. Therefore a jury could find implied malice, recklessness, and willful bad faith on the part of police officer Cook that preclude qualified immunity for him, and are issues for the jury as triers of fact to weight and decide upon, precluding summary judgment.

III.  The trial court erred in granting Defendants Arthur and Beth Hohman's Motion for Frivolous Conduct Sanctions against Plaintiff without holding an evidentiary hearing where witness testimony and evidence could be presented to oppose the motion, as required by O.R.C. 2323.51(B)(2), and where Ohio case law demonstrates that the denial of such an evidentiary hearing is contrary to law and abuse of discretion.

IV.   The trial court erred in granting Defendants Arthur and Beth Hohman's Motion for Frivolous Conduct Sanctions against Plaintiff by incorrectly ruling that the causes of action filed against the Hohman's by Plaintiff's attorneys were not supported by any case law or evidence. And erred in making a 'subjective' determination that Plaintiff must have filed her Complaint against the Hohmans to 'obviously' harass them when that ruling was not based on any actual facts or competent, credible evidence in the Complaint, and therefore was not an 'objective' determination and accordingly, was contrary to law and an abuse of process.