[Cite as *Dean v. Liberty Mut. Ins.*, 2018-Ohio-3042.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106046**

**CRYSTAL DEAN**

PLAINTIFF-APPELLANT

vs.

**LIBERTY MUTUAL INSURANCE, ET AL.**

DEFENDANTS-APPELLEES

**JUDGMENT:**
REVERSED IN PART,
AFFIRMED IN PART AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-16-864698

**BEFORE:** Blackmon, P.J., Laster Mays, J., and Jones, J.

**RELEASED AND JOURNALIZED:** August 2, 2018

**ATTORNEYS FOR APPELLANT**

Caryn M. Groedel
Matthew S. Grimsely
Caryn Groedel & Associates Co., L.P.A.
31340 Solon Road, Suite 27
Solon, Ohio 44139

Shawn Alexander Romar
2012 W. 25th St., Suite 716
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEES**

Alexander R. Frondorf
Robert M. Wolff
Janette M. Louard
Littler Mendelson P.C.
1100 Superior Ave., 20th Floor
Cleveland, Ohio 44114

PATRICIA ANN BLACKMON, P.J.:

**{¶1}** Crystal Dean ("Dean") appeals from the trial court's granting summary judgment in favor of Liberty Mutual Insurance, et al., ("Liberty") in this employment discrimination case and assigns the following errors for our review:

> I.  The trial court erred in granting appellee's motion for summary judgment on plaintiff's race discrimination claim.
>
> II.  The trial court erred in granting appellee's motion for summary judgment on plaintiff's promissory estoppel claim.
>
> III.  The trial court erred in granting appellee's motion for summary judgment on plaintiff's wage claim.
>
> IV.  The trial court abused its discretion in denying appellant's motions to compel and motions to enlarge discovery.

**{¶2}** Having reviewed the record and pertinent law, we reverse in part, affirm in part, and remand the case for proceedings consistent with this opinion. Specifically, we reverse in part the trial court's granting summary judgment on Dean's race discrimination claim; there exists in the record disputed issues of material fact regarding Dean's sales requirements and sales record. We affirm the trial court's judgment on the remaining issues. The apposite facts follow.

## I.  Facts and Procedural History

**{¶3}** In May 2011, Dean began working at Liberty as a sales representative. Per Liberty's policies and procedures for sales representatives, Dean attended a 12-week training program, then began a two-year "production validation period" ("PVP"). Each PVP is six-months long, during which sales representatives must meet certain sales requirements. Sales representatives are reviewed after each PVP, and if they complete all four PVPs successfully,

they will move on to what Liberty calls PMP-1. Dean successfully completed her first two PVPs ending in February 2012 and August 2012, respectively. Dean failed to meet her sales requirements for her third PVP ending in February 2013. According to her third PVP report, Dean was 52 policies below the requirement. However, Liberty did not terminate her employment at that time.

{¶4} In May 2013, Jeremy Hohn became Dean's area manager. In June and July 2013, during her final PVP, Dean took time off work for medical reasons. Per Liberty's policy, the months of June and July 2013 were excluded from her final PVP, and the review period was extended by two months from August to October 2013.

{¶5} On July 10, 2013, when Dean came back to work, her former manager sent her a PVP status report email showing that Dean's sales were below Liberty's requirements. Specifically, this report stated that Dean was "97 policies below the requirement" including "5 policies below the Life [insurance] requirement." The email stated that if Dean failed to meet her PVP requirements, her "employment will be subject to termination."

{¶6} In August 2013, Jessica Holden became Dean's branch manager. According to Liberty, when Dean's fourth PVP ended in October 2013, she had not met her sales requirements. However, according to Dean, in November 2013, Holden led Dean to believe that she had met her sales goals.

{¶7} In January 2014, Holden reviewed Dean's sales numbers "to see whether there was any way they could satisfy the PVP requirements." Specifically, Holden tried to include policies that were paid for after Dean's fourth PVP ended. Ultimately, Liberty concluded that sales representatives received credit only for policies that were paid for during the PVP in

question.   In February 2014, Liberty terminated Dean's employment for failure to meet her sales goals.

**{¶8}**   On June 14, 2016, Dean filed a complaint [1] against Liberty alleging race discrimination, age discrimination, promissory estoppel, and violations of the Minimum Fair Wage Standards Act.   On June 27, 2017, the court granted summary judgment against Dean and in favor of Liberty on all claims.   It is from this order that Dean appeals.

## II.   **Summary Judgment**

**{¶9}**   Before we review the merits of Dean's arguments under assigned errors one, two, and three, we address her allegation on appeal that the "trial court erred by failing to issue a written opinion."   This court has held that a "trial court is not required to issue a written opinion containing findings of fact and conclusions of law when ruling on a motion for summary judgment. * * * Rather, the trial court need only issue a judgment entry that contains a 'clear and concise pronouncement of the Court's judgment' and 'a sufficient pronouncement of its decision upon which to review the issues raised by appellants' appeal.'"   (Citation omitted.)   *Powers v. Ferro Corp.*, 8th Dist. Cuyahoga No. 79383, 2002-Ohio-2612, ¶ 30.   This rule is rooted in common sense, because "we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate."   *Jackson v. Glidden Co.*, 8th Dist. Cuyahoga No. 87779, 2007-Ohio-277, ¶ 8.   Accordingly, Dean's allegation that the court erred by not issuing a written opinion is meritless.

**{¶10}** Dean also argues that the trial court abused its discretion "by ruling on Liberty's MSJ without first granting Dean's Civ.R. 56(F) request for discovery."   Upon review of the

---

[1]This case is a refiling of *Dean v. Liberty Mut. Ins.,* Cuyahoga C.P. No. CV-14-830854, which was voluntarily dismissed without prejudice pursuant to Civ.R. 41(A) on August 27, 2015.

record, including the docket, it does not appear that Dean filed a Civ.R. 56(F) request for discovery. Obviously, the court cannot rule on a motion that was not filed; therefore, we find no merit to Dean's argument regarding this issue.

{¶11} Appellate review of granting summary judgment is de novo. Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that 1) there is no genuine issue of material fact; 2) he or she is entitled to judgment as a matter of law; and 3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Dresher v. Burt*, 75 Ohio St.3d 280, 662 N.E.2d 264 (1996).

## III. Race Discrimination

{¶12} Pursuant to R.C. 4112.02(A), it is unlawful for an employer, "because of the race * * * of any person, to discharge without just cause, * * * or otherwise to discriminate against that person with respect to * * * terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

{¶13} To prove a prima facie employment discrimination claim, a plaintiff must show, by a preponderance of the evidence, that he or she was 1) a member of a protected class; 2) subject to an adverse employment action; 3) qualified for the position; and 4) replaced by, or treated worse than, a person not belonging to that protected class. *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996). If the plaintiff succeeds, the case proceeds under a burden-shifting analysis as follows: "[T]he burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. * * * If the employer meets its burden, the plaintiff must then demonstrate that the reason the employer offered is pretextual and that the real reason was discriminatory in nature." *Lennon v. Cuyahoga Cty. Juvenile Court*, 8th Dist. Cuyahoga No. 86651, 2006-Ohio-2587, ¶ 9.

**{¶14}** Furthermore, Civ.R. 56(E) states, in part, that in opposing summary judgment, "an adverse party may not rest on the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Mere speculation is insufficient to overcome summary judgment. *Frankmann v. Skyline Mgt.*, 8th Dist. Cuyahoga No. 88807, 2007-Ohio-3922.

### III.A.   Dean's Prima Facie Case of Race Discrimination

**{¶15}** In the case at hand, it is undisputed that Dean is African-American, which is a protected class, and that she was qualified for the sales representative position at Liberty. Thus, Dean meets the first and third elements of a prima facie case of race discrimination. Dean testified that on February 7, 2014, Holder called her into the office and had a Liberty HR representative on speaker phone. The HR representative said that Liberty decided to terminate Dean's employment effective immediately. Dean asked why, and the rep stated that Dean "didn't hit the numbers." Dean testified that she felt like she was being discriminated against, "because I was told that I had hit that benchmark, and then for [the HR rep] to say that I hadn't hit the benchmark, I was just floored."
Termination certainly qualifies as an adverse employment action under the second factor of a prima facie case of race discrimination.

**{¶16}** As to the fourth prong of an employment discrimination claim, Dean argues that she was subjected to disparate treatment by Liberty in favor of other similarly situated Caucasian employees. Dean alleges that Liberty, Holden, and Hohn "favored" other employees over her; gave other employees more Affinity[2] accounts; gave her leads in "ethnic" and "economically

---

[2] Liberty defined an Affinity account as follows: "accounts with businesses who work with

deprived" areas such as Youngstown, while other employees received leads in Hudson; treated her differently when calculating the time frame of her final PVP as related to her medical leave of absence; and terminated her employment for not meeting her sales quota, although a Caucasian employee was allowed to keep his job when he failed to meet a sales quota.

### III.B. Liberty's "Legitimate, Nondiscriminatory" Reason for Termination

**{¶17}** Assuming that Dean has set forth a prima facie case of race discrimination regarding her termination from employment, the burden shifts to Liberty to articulate a "legitimate, nondiscriminatory" reason for termination. Liberty submitted evidence that Dean was terminated for failing to meet her fourth PVP sales requirements. For example, an email dated July 10, 2013, from Dean's former manager to Dean regarding her final six-month evaluation, stated, in part, as follows:

> Note of Probation: After 2 months of this PVP, you have sold 29 A/H/L policies. You need to sell 92 more policies, 8 of which need to be Life policies, by 9/30/2013 to meet your P&C and life PVP requirement. If you fail to do so, your employment will be subject to termination. I will confer with you frequently during the remainder of this PVP and will work with you to help you meet your PVP requirement. As we discussed, a copy of this letter will be made a part of your personnel file.

**{¶18}** Holden testified that she received a call from Liberty's HR department to verify Dean's "numbers" and "incentive report" during her fourth PVP.[3] After that, she received a

---

Liberty to provide life, home, and auto insurance to their employees."

[3]Liberty attached Holden's unsworn declaration to its motion for summary judgment, in which, Holden states as follows:

> In January 2014, I explored ways to count sales that would have allowed Ms. Dean to make her PVP 4 sales requirements. This included replacing October's numbers with November's numbers. However, the number of insurance policies sold by Ms. Dean in either month would not make the PVP 4 requirements.

phone call from Hohn, the area manager, in which he stated that "we would have to terminate Crystal." Asked if she had terminated anyone else for poor performance during Dean's tenure at Liberty, Holden replied, "No. * * * I did not have any instances besides Crystal's during that specific time frame where I had an employee in question for their PVP." Holden further explained that she was involved in the termination of another sales representative named Richard Wilson, because "[h]e was unable to secure a license that's required as part of the position." According to Holden, she does not have the authority to discipline sales representatives on her own. She would need to involve Hohn and Liberty's human resources department before taking any action. "Actually, I don't know who makes the final determination on the termination of reps."

{¶19} Hohn testified that, during Dean's fourth PVP, he and Dean had a coaching session, in which he gave her the following assistance or advice to increase sales:

> We talked about how to most effectively coach business. We talked about where she could find business. We talked about how to use her resources. We talked about a Subaru dealership that she was assigned to. We talked about on-site activity that could increase her sales. We talked about short-term activities, given the time frame, that were most likely to result in sales. And she also sat directly

---

> On January 10, 2014, I also sent an email thinking that there was a way to count life insurance policies that Ms. Dean submitted in October 2013, but were paid for in November 2013 (after the PVP 4 period concluded) towards Ms. Dean's PVP 4 requirements. However, I subsequently learned of the policy that Sales Representatives do not get credit for life insurance policies until they are paid for.

An unsworn declaration is not an affidavit. "An affidavit must appear, on its face, to have been taken before the proper officer and in compliance with all legal requisites. A paper purporting to be an affidavit, but not to have been sworn to before an officer, is not an affidavit." *State v. Smith* (*In re Pokorny*), 74 Ohio St.3d 1238, 1238, 657 N.E.2d 1345 (1992). Accordingly, Holden's declaration may not be taken into consideration for summary judgment pursuant to Civ.R. 56. However, we may take into consideration emails referenced in Holden's declaration that were properly attached to Liberty's summary judgment motion.

outside of the door of that office, so I then listened to what she was doing that day that we had a coaching session.

**{¶20}** Hohn testified that Dean was terminated because "[s]he did not meet the [sales] production requirement for the period of time in which we measured it," i.e., Dean's fourth PVP, which was from February 2013 to October 2013.

**{¶21}** Upon review, we find that Liberty met its burden of producing a legitimate, nondiscriminatory reason for terminating Dean's employment. Specifically, Liberty presented evidence, in the form of deposition testimony, emails, and PVP status reports, showing that Dean failed to meet her PVP sales requirements. To avoid summary judgment, Dean must demonstrate that Liberty's reason is pretextual and that the real reason for her termination was discriminatory in nature.

### III.C. Dean's Evidence that Liberty's Reason is Pretextual

**{¶22}** Excerpts from Dean's deposition follow:

### III.C.1. Summary Judgment Improperly Granted Regarding PVP Sales Requirements

**{¶23}** Dean testified that in November 2013, "Jessica Holden told me or at this point led me to believe that she had confirmed my numbers were met, * * * and even told me to take some time off, because she knew I was working hard and had worked a lot of hours. So she led me to believe that my goals were met and acted accordingly."

**{¶24}** Dean argues that, despite Holden telling her that she met her goals, Liberty ultimately changed its position and fired her for not meeting her sales requirements. Dean alleges that this inconsistency shows that Liberty's reason for terminating her was a pretext for discrimination, which is enough to overcome summary judgment. To support her argument for pretext, Dean alleges that Liberty treated her similarly situated Caucasian coworkers substantially

better than it treated her.  Specifically, Dean testified in deposition about her interaction with

Holden:

A:     I felt that she was not giving me the attention that — or she gave others more attention, in terms of help, than what she provided to me. * * * I felt that she would — how she relayed information was not always consistent. * * * I felt that I couldn't — I didn't feel confident that she gave me an answer, that it was — I just didn't feel that she was really looking out for my best interest.

Q:     What did she do or what didn't she do that made you think that she was not looking out for your best interest?

A:     It was probably more of what she didn't do. * * * And I felt that she didn't make it a priority to give the support in order for me to be successful. * * * I felt like an outsider. * * * Lack of support and witnessing other interactions in relation to mine with her.

Q:     Can you flesh that out for me a little more, other interactions in relation to yours; can you give me some examples?

A:     So there may have been lunch meetings that I was not invited to; it made me feel like an outsider, like, I guess for lack of a better term, it was like clique-ish, and I wasn't a part of that clique for the office. * * * I wasn't privy to the conversations, but the amount of time that was devoted and spent and also the type of accounts that these representatives were given access to.

{¶25} Dean also alleged that Hohn treated her differently than he treated other employees.

To support this accusation, Dean testified as follows:

A:     Our first meeting, I felt talked down to.  And from there, I believe that I wasn't viewed the same, from his standpoint, as the other team members were viewed.  I feel like and believe, because I am black * * *,[4] that I wasn't given the same level of support and talked to in a way that was almost like I was beneath him.

* * *

---

[4]Dean testified that she felt discriminated against "because I am black and I'm older * * *." In addition to race discrimination, Dean's complaint set forth a cause of action for age discrimination. Although the court granted summary judgment against Dean on her age discrimination claim, she did not appeal this issue; therefore, references to age discrimination were omitted from this opinion.

Q:      What did Mr. Hohn say to you that made you feel beneath him or belittled?

A:      I can't remember the exact wording of how he said this, but I walked away feeling like he's like, "You're not going to" — "You're not going to attain it," and I didn't feel that he was supportive in trying to help me attain it.   He was more or less, "Oh, you're not going to do it."

* * *

Q:      Did [Holden] actually say that he didn't think you were going to make it?

A:      Again, I can't recall his exact wording.   I just remember when I walked away; like, wow, I'm on my own.

**{¶26}** We agree with Dean on this issue and find that there are questions of fact regarding Dean's fourth and final PVP sales requirements, as well as her interaction with Holden and Hohn.   Specifically but not exclusively:   How many policies was Dean required to sell?   Did Dean sell the required number of policies?   Did Liberty lead Dean to believe that she met her sales requirements?   Did Holden and Hohn treat Dean differently than they treated other Liberty employees because of Dean's race?

**{¶27}** Accordingly, we find that the court erred by granting summary judgment on Dean's race discrimination claim as to this issue only.   Dean's first assigned error is sustained in part.

### III.C.2.   Summary Judgment Properly Granted Regarding                Dean's Remaining Allegations of Race Discrimination

**{¶28}** In granting Liberty's summary judgment motion, the trial court found the following: "Defendants supported their motion with admissible evidence and compelling legal arguments.   Plaintiff, by contrast, has not come forward with admissible evidence suggesting that there is a genuine issue for trial."   We agree with the trial court as to Dean's remaining arguments.   This court has held that "a nonmovant's own self-serving assertions, whether made

in affidavit, deposition, or interrogatory responses, cannot defeat a well-supported summary judgment motion when not corroborated by any outside evidence." *Lucas v. Perciak*, 8th Dist. Cuyahoga No. 96962, 2012-Ohio-88, ¶ 16. The party opposing summary judgment "must do more than supply evidence of a possible inference that a material issue of fact exists." *Carroll v. Alliant Techsystems, Inc.*, 10th Dist. Franklin No. 06AP-519, 2006-Ohio-5521, ¶ 17.

### III.C.2.a. <u>Lead Distribution</u>

{¶29} Dean alleges that Liberty discriminated against her by "[a]ssigning her fewer leads than her similarly situation Caucasian counterparts, and only assigning her leads in 'ethnic' and 'economically deprived' areas, such as Youngstown, which resulted in Dean having to travel further than her Causasian co-workers to follow up and meet with leads." As to how leads were distributed, Dean testified as follows:

> The PVP is made up of sales; sales come as a result of leads; leads that are in certain territories or areas are more ethnic, if you will. And so leads that I was given were in more ethnic areas, such as Youngstown, which were economically deprived areas. And other Caucasian reps would have had leads in more prominent areas, such as maybe Hudson, and that directly impacts the ability to close those leads.

{¶30} Dean offers no evidence, however, to support her belief that she was assigned fewer leads than other sales representatives or that a disparity exists between leads in Youngstown and leads in Hudson.

{¶31} Dean testified as follows concerning the leads that Liberty assigned to sales representatives:

Q: Were you assigned leads?

A: Yes.

Q:      Do you know whether you were assigned less leads than other sales reps?

A:      No.   I don't know.

{¶32} Dean's testimony that Caucasian sales representatives received "better" leads than Dean follows:

I would overhear.  I don't know for sure, but I would overhear that they had an appointment in certain areas. * * * That was one thing that lead me to believe that, in addition to the fact that I was receiving leads in certain areas, overhearing those conversations also helped lead me to believe that they were receiving leads in other areas, more prosperous areas.

{¶33} Accordingly, we find no factual disputes regarding this issue, because Dean failed to set forth sufficient evidence to overcome summary judgment that she was treated differently than other Liberty employees concerning assigned leads.

### III.C.2.b.   Affinity Accounts

{¶34} Dean testified that an "Affinity account" is "an organization, employer, or group that will allow Liberty Mutual to offer auto and home insurance to its members, employees, members of the organization."   According to Dean, she solicited two Affinity accounts on her own — the Cleveland Clinic[5] and a company called Chesterfield — and Liberty assigned her a local Subaru dealer Affinity account.

{¶35} Dean alleged that other employees received more or better Affinity accounts than she did.   However, Dean offered no evidence to support this allegation, other than her testimony that she "wouldn't be able to say how many" accounts other people had, because she did not "have access to that information."   Furthermore, asked if other employees solicited their own

---

[5]According to Hohn the Cleveland Clinic is not, and never has been, a Liberty customer or account.

Affinity accounts or were assigned these accounts by Liberty, Dean testified, "I don't know for sure."

**{¶36}** Dean further testified as follows concerning Affinity accounts:

Q:     So how many * * * and which Affinity accounts were assigned to sales reps?

A:     I wouldn't be able to say how many were assigned.

Q:     So you have no actual knowledge of how many were assigned and which ones were assigned, correct?

A:     I wouldn't be able to say how many were assigned.

**{¶37}** Upon review, we find no factual disputes regarding this issue, because Dean failed to set forth sufficient evidence to overcome summary judgment that she was treated differently than other Liberty employees concerning Affinity accounts.

### III.C.2.c.   Liberty's Policy Regarding Leaves of Absence and PVP Requirements

**{¶38}** Dean alleges that Liberty applied its leave of absence policy differently to her than it did to other employees.   Dean also alleges that she was treated differently than other employees when Liberty followed its policy of eliminating from the sales requirement two months in which Dean took leave of absences.   However, Dean offers no evidence to show how any other employee was treated under this policy.   Furthermore, Dean offers no evidence of her sales production during June and July 2013, the two months that were eliminated from her sales review.   Liberty, on the other hand, submitted evidence that Holden and Hohn attempted to add Dean's November 2013 sales numbers to help her meet requirements for her final six-month review period, but ultimately concluded that this would have been against company policy.

**{¶39}** Asked, "do you know of any other sales reps who took a leave of absence during a PVP cycle whose months were not backed out and not excluded from PVP?" Dean answered, "No."

**{¶40}** Liberty's leave of absence policy states in part as follows: "For leaves of absence (LOA) all months which are involved will be excluded for the purpose of PVP calculation." The policy further states that the PVP will be extended by the number of excluded months. Dean testified that she took a leave of absence from June 20, 2013 through July 2, 2013. According to Dean, she did not understand how this policy would "impact" her when she took her leave. A June 5, 2013 email from Liberty's human resources department to Dean shows, however, that Dean was aware of the policy at the time. This email states in part as follows:

> For leaves of absence (LOA), all months which are involved will be excluded for
>
> the purposes of PVP calculation. For example, if a rep goes on the comp plan
>
> 3/1/04 and goes out on LOA effective 4/28/04 and returns 5/2/01, the entire month
>
> of April and May will be excluded from PVP calculations. This rep's PVP cycle
>
> will be extended out from 8/31/04 until 10/31/04.

**{¶41}** After being shown this email in deposition, Dean testified as follows: "I do see this e-mail; however, as I stated, I don't feel that — I'm not sure if I was totally understanding of what this meant when I got this e-mail. I do see it now, but at that time I can't say I was totally understanding of what that meant."

**{¶42}** Asked if she was aware of Liberty applying this policy differently to different employees, Dean responded as follows: "I believe that it singles out women and people older. * * * I believe the policy has a discriminatory factor, in terms of race as well."

**{¶43}** Accordingly, we find no factual disputes regarding this issue, because Dean failed to set forth sufficient evidence to overcome summary judgment that she was treated differently than other Liberty employees concerning Liberty's leave of absence policy.

### III.C.2.d.   Termination of Caucasian Employee

**{¶44}** Dean alleges that a Caucasian employee was not terminated despite failing to meet sales quotas.   Liberty offered evidence that Jared Lowery, the employee in question, was in fact terminated for failure to meet sales quotas.   Hohn testified that Lowery was fired after not meeting his second PVP and was subsequently rehired by Liberty after gaining more experience with another insurance company. Hohn additionally testified that three other Caucasian sales representatives under his supervision were terminated for failing to meet their sales requirements.

**{¶45}** Upon review, we find no factual disputes regarding this issue, because Dean failed to set forth sufficient evidence to overcome summary judgment that Liberty retained a Caucasian employee who did not meet his sales goals.   Accordingly, the trial court did not err in granting Liberty's motion for summary judgment regarding these specific issues, and Dean's first assigned error is overruled in part.

## IV.   Promissory Estoppel

**{¶46}** Ohio is an employment-at-will state, and generally, either party in the employment relationship may terminate employment for any reason not contrary to law.   *Cruz v. English Nanny & Governess School, Inc.,* 2017-Ohio-4176, 92 N.E.3d 143, ¶ 64 (8th Dist.).   Limited exceptions exist to the employment-at-will doctrine, and one of them is promissory estoppel. Typically, to succeed on a claim for promissory estoppel, a plaintiff must show 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance by the party to whom the promise

was made; and 3) injury caused by the reliance. *Kiel v. Circuit Design Technology, Inc.*, 55 Ohio App.3d 63, 66, 562 N.E.2d 517 (8th Dist.1988). When promissory estoppel is raised in an employment setting, however, the burden is heightened. "The employee must demonstrate that she received a specific promise of continued employment upon which she relied to her detriment." *Corradi v. Soclof*, 8th Dist. Cuyahoga No. 67586, 1995 Ohio App. LEXIS 2162 (May 25, 1995).

{¶47} Dean testified that the following "promise" forms the basis of her promissory estoppel claim:

> Jessica Holden * * * led me to believe that she had confirmed my numbers were
>
> met, and this was back in early November, and even told me to take some time
>
> off, because she knew I was working hard and had worked a lot of hours. So she
>
> led me to believe that my goals were met and acted accordingly.

{¶48} Dean testified that "I can't say for sure if those were her exact words, but it was something to that effect * * *." Dean testified that, in reliance on what Holden told her, she did not look for another job and she continued to "build relationships for long-term * * * plans of employment with Liberty."

{¶49} Dean fails to allege that Liberty offered her a promise of continued employment. Construing the evidence in a light most favorable to Dean, as we must, we find that reasonable minds can come to but one conclusion, and that conclusion is adverse to Dean. Accordingly, the court did not err in granting summary judgment to Liberty on Dean's promissory estoppel claim. Dean's second assigned error is overruled.

## V. **Minimum Fair Wage Standards Act**

**{¶50}** Ohio's Minimum Fair Wage Standards Act states in part that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek * * *." R.C. 4111.03(A). "When an employee asserts a claim for unpaid overtime, the employee carries the initial burden of demonstrating that she performed work for which she was not adequately compensated." *Handford v. Buy Rite Office Prods.,* 8th Dist. Cuyahoga No. 99734, 2013-Ohio-4712, ¶ 21. A plaintiff must "do more than generally allege that she worked off the clock." *Id.* at ¶ 23.

**{¶51}** Dean testified that prior to Hohn becoming her area manager, she would "balance out" her work hours using flex time so that she would work approximately 40 hours per week. Dean explained that, as a sales representative, she would have to be available to accommodate customer needs. For example, if she worked until 9:00 p.m. one night, she would come into the office later than ususal one morning. "I would work around my customers in such a way that I didn't really need to necessarily submit overtime."

**{¶52}** Dean alleges that after Hohn became her area manager, she was required to be in the office by 9:00 a.m. everyday. Dean could not remember exactly how many hours each week she worked, "but it happened more often than not that I was working over 40 hours." According to Dean, Hohn's policy was that "the overtime had to be preapproved." Dean testified that, when she "knew in advance" she would "put in for overtime." Dean testified as follows about what happened when her overtime hours were not preapproved:

> Q:  Did you put in the hours that you worked above and beyond 40 hours a week in the time system so you could be properly compensated for that time?
>
> A:  No, I did not.

**{¶53}** Dean testified that, even when she did not submit overtime hours, Holden knew Dean was working overtime because Holden saw her "sitting at [her] desk until 9:00 at night."

Dean testified that when she did request overtime, it was never rejected and she was always paid for it. Liberty presented Dean's time sheets for her entire employment with Liberty. They show five weeks during the time Hohn was the area manger in which Dean submitted and was paid for overtime hours.

{¶54} Asked why she did not record all of the overtime she allegedly worked, Dean responded as follows: "[Y]ou couldn't claim overtime over a certain number unless it was preapproved, so I think * * * the fact that I was busy doing sales and some other things, and this wasn't my priority, calculating the overtime at that point, because I had bigger fish to fry that I was focused on at that point." Asked if she could identify any overtime that she worked but that she did not record, Dean answered, "Not at this time."

{¶55} Dean failed to produce any evidence showing the amount and extent of overtime she allegedly worked and she failed to produce evidence that she submitted to Liberty any overtime hours she worked but for which she was not paid. Accordingly, we find that Liberty is entitled to judgment as a matter of law on Dean's Minimum Fair Wage Standards Act claim. Dean's third assigned error is overruled.

## VI. Motions to Enlarge Discovery and Compel Discovery

{¶56} Appellate courts review the denial of a motion to compel discovery for an abuse of discretion. *State ex rel.V Cos. v. Marshall*, 81 Ohio St.3d 467, 469, 692 N.E.2d 198 (1998). "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence." However, "[t]he court may permissibly limit discovery so as to prevent mere 'fishing expeditions' in an effort to locate incriminating evidence." *Bland v. Graves*, 86 Ohio App.3d 644, 659, 620 N.E.2d 920 (9th Dist.1993).

{¶57} The initial discovery cutoff date in this case was December 2, 2016, which was just shy of six months after Dean filed her complaint. On September 1, 2016, the parties filed a stipulated protective order, which the trial court signed and journalized on September 21, 2016.

{¶58} On November 8, 2016, Dean filed a motion to compel and an "unopposed motion to enlarge discovery," alleging that Liberty failed to respond to certain interrogatories and failed to produce various requested documents. Liberty opposed Dean's motion to compel, arguing that 1) it properly responded to most of Dean's interrogatories and requests for production of documents; 2) the parties were involved in ongoing discussions regarding discovery, and Liberty's intent was to produce further documents that were relevant and did not impose an undue burden; and 3) much of the information Dean was seeking was properly obtained through deposition testimony. Liberty further argued that Dean's motion to compel was premature as the parties had agreed to extend the discovery deadline with the court's approval.

{¶59} On November 29, 2016, the court granted Dean's motion to enlarge discovery and extended the discovery cutoff date to February 28, 2017. The court denied Dean's motion to compel.

{¶60} On January 19, 2017, the court held a conference call with the parties at which the litigation schedule was modified to extend the dispositive motion deadline to April 11, 2017 and set a trial date for September 5, 2017. There is no mention of discovery disputes in the journal entry memorializing the conference call.

{¶61} On February 1, 2017, Dean filed a second motion to compel discovery, to extend the litigation schedule, and for sanctions. This motion, including exhibits, is just over 250 pages, and the substance is substantially similar, if not identical, to Dean's first motion to compel.

{¶62} Liberty opposed Dean's second motion to compel, arguing that Liberty answered Dean's relevant discovery requests, and Dean failed to narrow the scope of her remaining discovery requests. For example, Dean requested the production of "all employment-related documents" for "all Sales Representatives" who worked under Holden and Hohn during a six- or seven-year span. Liberty argued that this request was overly broad, but in good faith, Liberty produced the personnel files of eight sales representatives who were similarly situated to Dean. Liberty also produced a list of all sales representatives at the office in which Dean worked from July 2013 through July 2014, along with their PVP sales reports.

{¶63} Liberty further argued that the court rejected Dean's position on discovery when it denied her first motion to compel. Liberty also opposed granting further time extensions on discovery.

{¶64} On February 14, 2017, the court denied Dean's motion. However, on February 24, 2017, the court "expressly permitted" Dean to depose Hohn on March 1, 2017, which was one day after the discovery deadline.

{¶65} On March 8, 2017, Dean filed a motion for reconsideration of the court's denying her discovery motion, which the court denied on May 2, 2017. The arguments in this motion are the same as the arguments in Dean's first and second motions to compel.

{¶66} On appeal, Dean's entire argument under this assigned error is as follows:

[T]he trial court without explanation: prohibited Dean from obtaining discovery she needed to prove her case by denying her Motions to Compel; denied Dean's

Motions for Reconsideration of the court's 2/14/17 rulings; and denied Dean's Rule 56(F) Motion for Enlargement of Time to Conduct Additional discovery after Liberty filed its MSJ. The trial court thus hamstrung Dean's discovery efforts [and] failed and refused to compel Liberty to provide discovery, and then granted its Motion for Summary Judgment.

**{¶67}** Dean fails to argue why or how the court abused its discretion in ruling on her discovery motions. Dean offers no analysis in her brief and instead summarily concludes that the court erred by denying her motions. In fact, in her appellate brief under this assigned error, Dean makes no reference to the discovery she sought to compel.

**{¶68}** Upon review, we find that Dean failed to show that the court abused its discretion in ruling on her discovery motions. Dean failed to argue, let alone show, that the court's attitude was unreasonable, arbitrary, or unconscionable. Accordingly, Dean's fourth and final assigned error is overruled.

## VII.   Request for Reassignment

**{¶69}** In Dean's appellate reply brief she requests that this case be reassigned to a different trial judge upon remand. Pursuant to Loc.R. 15(J) of the Court of Common Pleas of Cuyahoga County, General Division, "[i]f a case disposed by an assigned Judge is reversed and remanded by an appellate Court the case shall be returned to the docket of the assigned judge." Furthermore, Loc.R. 2(C) of the Court of Common Pleas of Cuyahoga County, General Division states that the "Administrative Judge shall be the presiding officer of the General Division and shall have full responsibility for and control over the administration, and docket and calendar of the General Division * * *" of the common pleas court. *See also Brickman & Sons, Inc. v. Natl. City Bank*, 106 Ohio St.3d 30, 2005-Ohio-3559, 830 N.E.2d 1151, ¶ 21 ("assignments must be free from the appearance of impropriety. However, the rules are also designed to prevent judge-shopping").

{¶70} Under App.R. 12(A), this court's authority is limited to reviewing and affirming, modifying, or reversing a trial court's judgment. Additionally, this court has held that "[p]ursuant to R.C. 2701.03(A) and Ohio Constitution, Article IV, Section 5(C), the Chief Justice of the Ohio Supreme Court has exclusive jurisdiction to hear claims for disqualification." *State v. Webster*, 8th Dist. Cuyahoga No. 102833, 2016-Ohio-2624, ¶ 145. Accordingly, we are without the authority to rule on Dean's request for reassignment.

{¶71} In summary, the trial court's granting summary judgment on Dean's race discrimination claim is reversed in part and affirmed in part. The trial court's granting summary judgment on Dean's promissory estoppel and wage claims is affirmed. The trial court did not abuse its discretion by denying Dean's motions to compel and to enlarge discovery.

{¶72} Judgment reversed in part, affirmed in part and case remanded to the trial court for proceedings consistent with this opinion.

It is ordered that appellees and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
LARRY A. JONES, SR., J., CONCUR